Good morning. I am presiding briefly this morning because our chief has a motion to make to the court. So before we do anything else, I'm going to recognize Chief Judge Rader and ask him to present his motion. We have, Dan, please stand up. We have the joy this morning of allowing one of our finest law clerks to join our bar. And I'd like to move the admission of Dan McCollum to the bar of the Court of Appeals for the Federal Circuit. He is a member of good standing in other state bars. And we feel like he has served us all magnificently. He had the great honor of serving for the late Dan Friedman, one of our greatest judges. And then had the chance to come and serve me magnificently for several months. And I don't think it was me alone he served. No, he served a number of us quite admirably. And I understand that Judge Rader would like to second the motion before I take it under consideration. Yes, I would like to second the motion. And it's with great pleasure that I do that. Dan has also worked for me. And it's just wonderful to be part of this, of his admission to the bar, given the outstanding work that he provided me. Very diligent, timely work. And he always comported himself in a highly professional manner. So it's been my privilege being associated with this young man. So I would move his admission. I would point out that the only blemish on his entire record is that his underlying state bar membership is from New York. We'll have to let that slide. We're going to let that go this time? All right. But I would move his admission to the bar of the Federal Circuit with great enthusiasm. All right, Dan, I thank you for your service. I grant the motion. I welcome you to the bar. And I ask you to turn to the clerk so that you can receive the oath. Please raise your right hand if you swear or affirm that you will report yourself as an attorney and counselor to this court, uprightly and according to law, and in accordance with the Constitution of the United States of America. I do. Congratulations, and welcome to the bar of the United States Court of Appeals. Thank you, Dan. Thank you, Dan. Before we begin, the court notes that Judge Wallach from the Court of International Trade is in attendance, and we welcome him with great enthusiasm, hoping that we welcome him very soon with even more enthusiasm. Now our next case is Shell Oil Company versus the United States. Mr. Tassini. May it please the court, I'd like to make three main points here. First, the ABGAS contracts do not indemnify cleanup costs caused by the oil company's business decisions to dump acid waste. Taxes, fees, or charges levied on the production of ABGAS is not equivalent to damages for property damage ordered by a court. And the plain language of the contracts simply does not cover remediation of property damage. Second, President Roosevelt explicitly imposed, but the language of the contract says, any new or additional taxes, fees, or charges. Now this seems to fit in all three categories. It's kind of a tax, a cleanup tax. It's certainly a fee that they have to pay, and it's certainly a charge. How do you get around the breadth of that contract language? Well, for a number of reasons. First of all, if you look in the Superfund statute, or in fact the district and Ninth Circuit court cases that underlie this case, the word charge appears nowhere except for the term person in charge. So there is no basis in the statute for determining that cleanup costs were a charge. So what do you call them if they're not charges? Do you call them costs? Like somebody has to pay them. The costs are, we charge costs at the end of a case, so aren't we charging someone? These are damages ordered to be paid by a court, and something along the lines of the indemnity clause of DuPont certainly unequivocally covers those sorts of damages. And likewise, if you look at the context of the entire taxes, it really appears to be a price adjustment clause, where it adjusts the price paid for the ABGAS to take into account new and additional taxes, fees, and charges that are imposed during the period of performance of the contract. In fact, the contract itself says that the government will pay all monies due for the ABGAS every month, and there's no indication that the parties intended any obligations to linger beyond the termination of the contract. Where does it say that that obligation terminates with the end of the contract? It only says that monthly, it says that the government will pay monthly all money due for gasoline delivered by the seller, and it has no other provision for payment after termination of the contract. So what Shell is trying to do is ask the court to write in something on the terms of the CSA termination agreements in Ford and DuPont, where the termination agreement contained a specific provision covering, quote, costs not now known. Well, there's nothing analogous in this case. And this court's decision in Consumer's Ice really compels a determination that if the contract can be read to not lock the parties into permanent obligations, then that's how it should be read. It's not the other way around. Consumer's Ice is a case that really applies here, where there was a lease that could be read as either ending on a date certain or the date that the government decided not to use the land for anti-aircraft purposes. The government contended that the lease was enforced until the government decided not to use the land for anti-aircraft purposes, not the date certain, which had already passed. This court rejected that approach and applied the longstanding rule that it would not infer permanent obligations under a contract unless there was a clear and explicit requirement in the contract. But essentially, your arguments are precisely those that were made by Judge Schall in dissent in Ford. But that was a dissent. So what do we do with that as this panel? We respectfully disagree with that. Judge Schall in Ford, in his dissent, what he concluded was that indemnification for property damage wasn't enough. And Judge Schall distinguished Ford from the DuPont decision. But in this case, there's no indemnity for property damage, which is what this court in DuPont really concluded that Superfund liability was. It was remediation of property damage. It was remediation of a public nuisance, of a tort. And the court concluded in DuPont that the contract provided very broad indemnity, which covered those sorts of liabilities. There's absolutely no indication in this commodities purchase contract that's at issue here, instead of the cost plus contract where the government owned the facility and DuPont was merely an agent operating the facility. There's no indication here that there was any sort of intent along those lines. Isn't it fair to assume that the production of avgas is going to result in waste? Even as a judge, as a layperson, it seems to me that the production of avgas, and clearly the record shows that there's a tremendous amount of waste that was produced. Well, that's true. And yes, it would result in the production of waste. But independent business decisions to dump the waste are very different. The Ninth Circuit concluded that the oil companies had other disposal options for their acid waste. They dumped acid waste from operations other than avgas at the McColl site, and that they were not compelled by the government to dump acid waste in any particular manner. There were options available to the companies. They made separate independent business decisions to dump acid waste. And in fact, I understand that. But when I look at the clause that we're talking about, and it says any new, and then you go on additional fees, taxes, or charges other than income, and there's excess profits, corporate front, why should we read that to mean waste as a result of the production of avgas? Because, well, first of all, it would be costs incurred due to their business decision to dump waste, not costs incurred due to their production of avgas. That's very different. But you're, at that time, urging them to do more and faster, and please move this quicker. We need more gas and more and more. Why wouldn't they take whatever is the quickest and most expedient way? And you would urge them to do that in the 1940s and 50s. There's absolutely no evidence in this case that the government urged the oil companies to do so. And that stands in contrast. You're certainly urging them to get us more gas quicker. That's true. But the government never urged any particular sort of waste disposal method. And in fact, the companies had been treating acid waste before the war. But you said you'd pay for any new charges. And then the other part of this clause is that it says you shall pay. It's not even in any way discretionary. Well, that's true. And there are a number of reasons why this does not apply. This does not identify for property damages. Wouldn't the upkick in the production of avgas, because the record shows that there was a certain high level of production of avgas, and then suddenly it shot up as a war effort expanded. Wouldn't that upkick in the production of avgas and the resulting waste be a new charge? No, because for a number of reasons. One, the companies made a separate and independent decision to dump acid sludge. And later- They asked for funding for disposal sites and disposal mechanisms. And the government denied it. Well, that's inaccurate. That contention that Shell makes isn't borne out by the stipulated facts. There were two particular sites that the government did not allow preferences for the building of acid regeneration plants. One was in Northern California as opposed to Southern California. That was the Monsanto plant that was only going to take Northern California waste, so it was irrelevant to this case. And what occurred in that case was the government initially granted the preference, and then Monsanto let its six-month preference lapse. And by the time Monsanto asked for the preference a second time, it was already late into 1944, and the government denied the preference. But at that point, it wouldn't have made a difference, because by the time they'd gotten the plant built, it would have been- the war would have been over. And similarly, Texaco asked, originally in the beginning of the war, to build a reprocessing plant. The government denied that reprocessing plant because Texaco had a contract already for waste disposal with the Stauffer Company, so there was no need for that excess capacity at the time. What would you advise us to do with Judge Smith's decision to sever this case in light of the ethical issues? I believe the court should vacate and remand for the trial court to assign the case to a different judge. The whole case? The whole case, yes. The whole case, because the statute, Section 455B, requires recusal from an entire proceeding. It's a mandatory statute. And in the case here, Shell only contends that- financial interest, or his wife had financial interest. But he has retained the case, or he retained the case, with respect to two other plaintiffs for whom the same issues of fact and law govern. So in essence- Are we to assume from the record that there was no divestiture of the interest? We're unaware of any divestiture. There was not any divestiture as of the time we filed our notice of appeal, or as of the time of the severance. Your reply brief was notably silent with respect to the argument of harmless error. If we were to say, all right, we'll just look at this de novo, so whether or not there was a conflict, we can resolve it by making sure that we look at everything with a de novo review. You didn't respond to that in your reply brief. Do you want to respond to that now? I believe we addressed that issue in our opening brief. And we didn't want to burden the court with extra briefing and a rehashing of what we said at the beginning. But there are really two main reasons why a harmless error analysis would not be advisable. First, whenever a trial court decides a case on summary judgment, all of a sudden it's no harm, no foul with respect to mandatory recusal. And that can't be congressional intent to write out that section of the statute for a huge swath of cases. And the second reason is that this court is a reviewing court. I mean, yes, it does have a de novo standard of review, but it reviews judgments. And if the judgment below really should be a nullity, then affirming that nullity below is inadvisable. What's the procedural measure that we should utilize in order to, you say, to vacate? Is it your view that we can simply vacate and remand? Or is there another procedural device that's available to us? I think vacature and remand is the preferable method. That's what the court did the first time. I mean, as we noted in this case's long and tortured history, we appealed from the original judgment with respect to the four oil companies. And this court vacated the judgment and remanded it back to the Court of Federal Claims. And the trial judge, even though the government had filed a motion with the chief judge to transfer the entire case to a different judge, the trial judge himself immediately reissued both Shell 1 and Shell 2, the liability and damages opinions, only with respect to the two appellees in this case. What's the status of the case before now the new Court of Claims judge? That's before Judge Wheeler, and it's currently state-pending resolution of this case. And I take it that goes to your argument that whatever we do here could impact that case? Oh, yes, it will. It will be dispositive in that case, most probably. All right. Thank you, Mr. Tussini. Thank you. Mr. Kirk. Thank you very much, Judge Rader. And may it please the Court, let me begin with the contractual arguments. The costs at issue in this case are what CERCLA defines as, quote, costs of removal or remedial action. Now, I disagree slightly with my friend's characterization of the costs at issue as tort damages. That's not precisely accurate. These are costs incurred cleaning up a mess, straightforward costs, that in the CERCLA action, the oil companies, Shell and Atlantic Ridgefield, were ordered to bear. So it's not damages. It's costs. And if you look at the language of the contract, it uses the term taxes, fees, or charges. Judge Rader makes a fine argument that probably taxes and fees even cover it, but most certainly charges do. If you look at the ordinary definition of the word charges, we've provided the Court with definitions from legal dictionaries, English dictionaries, World War II dictionaries, current dictionaries. But what about the fact that it does not contain language, like the other cases, where the discussion of things that are known or unknown are into the future? Are you saying that the mere use of the word additional somehow creates this future obligation, no matter how long out into the future it goes? Yes, Your Honor. I would say the phrase new or additional charges most definitely bespeaks a future-looking impact for these charges. But I would add, Your Honor, that that's probably unnecessary under this Court's decision in Ford. In that case, the Court was quite clear that an obligation to reimburse for- But counsel, in Ford, the contractual language was much different than it is here. And you just used the word reimbursable, reimbursement. And both words indemnification and reimbursement are used throughout the briefs. But show me, in this clause that we're talking about, where does it say indemnification? Where does it say reimbursement? I look at this, and having handled contract matters in a prior life that I lived not too long ago, and indemnification clauses look a lot, lot different than this one does. Your Honor, it doesn't use the word indemnify, but the word it does use is buyer shall pay. Shall pay. And it goes on to say shall pay anything that's required by municipal, state, or federal law in the United States running for it to collect or pay. Are you saying that there was a law that existed at that time that required the dumping at the site? It did not require the dumping of the site. But Your Honor, what this clause says is that if there are any new or additional charges that the seller, the oil company, is required by a federal law to pay by reason of the production of the ABGAS, then the government must reimburse that. And in this clause, there's no temporal limit put on when those costs might arise, when those charges might arise. And that's what this court in Ford held. The language the court used there was that in the absence of any language putting a temporal limit on, the promise to pay is not barred merely because the originating events are long past, for the liability for the cleanup did not arise until after the enactment of CERCLA. Now, my friend meant. But in Ford, the language said, but which are not now known. I mean, they contemplated not knowing. The phrase in Ford was not now known, Your Honor. But I would say new or additional is equally forward looking. I mean, new or additional obviously contemplates something coming later in time. And there's no limit put upon that in the contractual language. In looking at this, and your clients are sophisticated business entities. Yes, Your Honor. And you're in the business of producing petroleum products, or ABGAS at that time. Did you not know that there was going to be waste as a result of the production? It was known that waste would be produced, yes, Your Honor. But at the time. Why was there no clause in the contract or any type of provision that specifically addressed waste or byproducts? Because it was not necessary, Your Honor. The clause that is in the contract is not limited to waste. It's limited to any additional charges. Any additional charges that in any way relate to the production of ABGAS. Waste is one charge, although at the time, obviously, it wasn't anticipated. This charge didn't arise until a half century later when Congress enacted CERCLA. A problem here is that this language comes under the heading of taxes. And it just seems to me that you knew that there was going to be waste, and something had to be done with the waste. You're a commercial entity. Is it reasonable for me to believe or to find that this language under taxes included waste? Your Honor, it is reasonable for you to believe that this language included any charges that the oil company was required to pay, any new or additional charges that they were required to pay by reason of a new law. In this case, a new federal law. But the clause is broader than that. It covers any law from any source as a result of the production of ABGAS. In terms of the cost that they knew about at the time, the way the contract was set up, Your Honor, and this is clear from the district court's opinion in the CERCLA case, all of the costs were built into the price, which is covered by sections four and five. And what this clause, the clause that we're looking at, and I'm on appendix page 202, Your Honor, this says, buyers shall pay in addition to the prices established in sections four and five. And basically, the purpose of this clause was our overall deal is the government's paying all the costs associated with the production of this product. And this clause was designed to protect the buyer, or protect the seller, the oil companies, against some new law that comes along later. So you disagree with the argument that we need to read this in the context of the payments owed under sections four and five? Correct. And in fact, my friend argued that the clause in section four that said they pay the amounts due monthly, that that supports him. To the contrary, that's irrelevant, because the clause I'm relying on specifically says, in addition to the amounts paid under sections four and five. And Judge Rayner, to return to the overall intent here, the basic intent is pretty clear. The oil companies weren't supposed to make a mint off this, but they were supposed to have their costs covered. And this clause, in particular, recognized that governments make new laws all the time. And sometimes when they make a new law, some additional charge, or fee, or tax that wasn't anticipated at the time might be imposed such that the cost of producing this product will go up. And what the party said is, if there's a new cost associated with producing this product, the buyer, the government, must pay it. Should we be listening to these arguments at all in light of the clear requirements that a judge must, when faced with any financial interest, no matter how small, must recuse? Your Honor, let me make two arguments on that. First, I think what Judge Smith did, the way he addressed the problem when it came to his attention, is consistent with the statute. Now, I'll acknowledge that I don't have a case that says that, but my friend doesn't have a case that says it's not the correct course. But what he did was he recognized that the statute says you cannot sit on a case in which your spouse has an interest in one of the parties. And the remedy he chose solved that problem. He got rid of the parties that created the conflict. But how do you deal with the fact that there's no question but that these cases are so interrelated? The only reason they're interrelated, Your Honor, is I think, as a practical matter, and I agree with my friend that what this court rules will govern the other case, but that's a function of the precedential nature of a hierarchical court. And the way to think about that, Your Honor, is if- But we're ruling based on what the government would argue is a tainted underlying judgment. I strongly disagree with that, Your Honor. Your Honor is addressing de novo, pure questions of law with no deference whatsoever to the court below. And on the harmless error point, what was lost, perhaps, in the discussion with my friend, I don't just make that as a good argument. I make it as a good argument that's been accepted by six different circles. Every single one of those cases you cite, your string cite, they were all under 455A. That's true. It doesn't have anything to do with the financial interest. And the Supreme Court has said that the rules are much stricter when you're talking about financial interest as opposed to the appearance of impropriety. If you look at my footnote off of those cases, I acknowledge that. But I cited this court's Polaroid decision and the Supreme Court's Lilligberg decision, both of which say that for purposes of the remedy or the harmless error analysis, there's no real difference between a 455A case and a 455B case. I'm not sure the Supreme Court's Lilligberg decision said exactly that. But it did say that courts of appeals have discretion with respect to what's the appropriate remedy. But then in that case, they said because we're talking about before, they said even if they were under A, the remedy almost always has to be to vacate. In that case, if you look at Lilligberg, the emphasis on why they had to vacate was because the judgment below turned on factual findings the trial court had made, which the court of appeals would be bound to defer to. This case is different. You're looking at pure questions of law that you give no difference at all to the judgments made. And that's the thinking behind every circuit that's decided that. Yes, they're 455A cases. But again, I'd ask you to look at your own Polaroid decision and Lilligberg, which does say that in terms of the duty to recuse, 455B4 is absolute. If you own one share, you must recuse. What about the argument that we're just creating a no harm, no foul argument with respect to something as important as a financial interest in the litigation? Lilligberg does create a no harm, no foul rule, Your Honor. It asks the question, is anyone prejudiced by the fact? If you find that Judge Smith made a mistake here in the way he handled this, is anyone prejudiced by the mistake? The statute would say that, yes, the public is prejudiced. And if we were to continue on with the case and decide the case and not address the issue, what happens with the purpose of the statute to protect the integrity of the court and the judicial system? Judge Raynor, the integrity of the judicial system is fully protected by the fact that every issue in this case will be decided by three judges, untainted by any conflict. The ruling that Judge Smith- You're asking us to move away and to leave alone an entire proceeding that is addressed under 455. Your Honor, what I'm asking you to do is affirm a judgment after you have de novo reviewed the legal arguments. I would be in a very different profile if this case came to you on factual findings where you were required to defer to Judge Smith, again, assuming you find that he erred in the way he handled the conflict. But because the case comes up, and I'd ask you to look at Lilliburg, Judge- So any time it's, I think Mr. Tosini suggested that any time we have a summary judgment, we are not going to apply the financial interest requirements? I wouldn't put it that way, Your Honor. I would say you're going to analyze the financial interest requirements. If you find that the court, the judge below, erred in applying those, you can so state. But Lilliburg says it's a separate question. What do you do about it in the case before you? And it asks the question, is there any harm to the parties? Is there any harm to the public? And what all six of my cases say, six different circuits. So this court would be creating a circuit split. I would respectfully submit if it went the other way on this. What they all say is, there's no harm to the party to the government in this case. There's no harm to the public. Because what the public will see is that all of the legal questions that were presented in this case were decided without an ounce of deference being given to the judge below. And particularly in a case like this, what Judge Smith did is arguably within the, it is within the plain language of the statute. And there's no case saying that what he did is wrong. The statute contains a very specific mechanism. He could have divested himself. At least he could have used that mechanism and then notified the parties. There would have been a different, at least, analysis that we could apply. Judge O'Malley, you're right. The statute does authorize the problem to go away if the judge's wife, in this case, had divested herself of the shares for whatever reason that that was not done. So absent doing that, I fully agree with your honor that Judge Smith could not sit on Texaco's case, on Union Oil's case. But he didn't. He divested himself of the plaintiffs, if you will. Where in the under 455 or any other statute or judicial canon of ethics do you find grounds for what you just said? 455 being? Where instead of disqualifying yourself, you spin off a party before you? Judge Raynor, the statute doesn't specifically say you can do it. But what it does say is what you shouldn't do. And what you shouldn't do is sit on a case where your wife owns shares in one of the parties. And the solution Judge Smith adopted met the letter of that. And my submission to you is that by meeting the letter of that and not having a case to the contrary, what he did was within the letter of the statute and can be upheld. But if you disagree with that, I would just simply ask you to follow your six sister circuits, all of whom have said that in summary judgment cases, it's harmless error by virtue of the de novo review that the Court of Appeals provides. And I see my red lights on. Thank you, Judge Raynor. Thank you, Mr. Kirk. Mr. Cassini, you have about a minute and a half. I'll try not to take it all. First, I'd like to note that Mr. Kirk stated that the government didn't require dumping at the site. Well, under the taxes clause, that's exactly the sort of activity that would be covered, some sort of compelled action. And there was no requirement that the oil companies dump. Well, there was no penalty for dumping back then either. I mean, CERCLA is a new charge that was created under federal law. It didn't exist as a charge or a tax at the time. But it certainly effectively is just the federal government saying you can't do this anymore. CERCLA is not a charge. It's really the cost of remediating property damage or remediating a public nuisance, as this court noted in DuPont. So in that respect, did it stem from the production? Was this basically a tax fee or charge that was assessed on the production of Avgas? Or is it the consequence of their separate and independent business decisions to contract with Mr. McLaughlin? The clause you're talking about is very broad. It says, by reason of the production, manufacture, sale, delivery. Certainly, this activity fits under that broad language. It was by reason of the manufacture and sale and production that they had waste, isn't it? That they had waste, not that they selected, that they chose to dump the waste with Mr. McCall. And that also segues into the whole allocation decision reached by the trial court. Basically, as we noted in our briefs, the oil companies dumped vast amounts of acid sludge before the war from non-Avgas products. If you look at page A560, STIP 409, you can see Shell's numbers, the amount of acid waste that they dumped. We really don't need to debate the actual facts, because the question is whether or not the findings of fact made in the CERCLA action are binding. And if they're not, then somebody has to start over, right? The stipulated facts are binding. There are really no findings of fact by any judge, because the district court got reversed. The closest thing to a finding of fact is the determination by the Ninth Circuit that the oil companies had other options for their waste and that they dumped waste resulting from the production of other products. I understand, but if we were to decide this case and conclude, consistent with your argument, that the Ninth Circuit did not endorse those findings of fact and that they're therefore not binding and don't have preclusive effects, we would have to remand for fact finding as it relates to the other facts in the record with respect to the apportionment, correct? Yes, the court would have to remand with respect to apportionment. But one way to, in doing so, the court should keep in mind the decision in Energy Northwest, where the court made clear that if there are costs that would have incurred, even without the breach, such as the costs related to dumping of acid sludge that came from non-ABGAS products, those are out of any judgment. And in this case, most of the waste at the site would still have been generated, regardless of whether the oil companies produced ABGAS. Do you have a final thought for us, Mr. Cassini? If the court has no further questions, we respect the request of the court.